**THE UNITED STATED DISTRICT COURT**
**DISTRICT OF MINNESOTA**

JAKE VALE, on behalf of himself and all others similarly situated,

Plaintiff,

v.

HOYT ARCHERY, INC.; ARCHERY TRADE ASSOCIATION, INC.; BOWTECH INC.; BPS DIRECT, LLC d/b/a BASS PRO SHOPS; CABELA'S LLC; DICK'S SPORTING GOODS, INC.; JAY'S SPORTS, INC. d/b/a JAY'S SPORTING GOODS; KINSEY'S OUTDOORS, INC.; LANCASTER ARCHERY SUPPLY, INC.; MATHEWS ARCHERY, INC.; NEUINTEL LLC d/b/a PRICESPIDER f/k/a ORIS INTELLIGENCE; PRECISION SHOOTING EQUIPMENT, INC; and TRACKSTREET, INC.,

Defendants.

**CLASS ACTION COMPLAINT**

**Case No. 0:25-cv-3110**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

**Page**


INTRODUCTION ..... 3

JURISDICTION AND VENUE ..... 5

PARTIES ..... 6

Plaintiff ..... 6

Defendants ..... 6

*Trade Association Defendants* ..... 6

*Upstream Manufacturer Defendants* ..... 7

*Downstream Retailer and Distributer Defendants* ..... 8

*Co Conspirators and Agents* ..... 9

INTERSTATE TRADE AND COMMERCE ..... 10

THE RELEVANT MARKET ..... 11

ATA INVOLVEMENT IN THE CONSPIRACY ..... 12

The ATA ..... 12

The ATA Board ..... 13

The ATA Retail Council ..... 14

ATA Trade Shows ..... 14

ATA Connect ..... 15

The ATA Retail Business Tracker Survey ..... 16

DEFENDANTS' AGREEMENTS TO ADOPT AND ENFORCE MAP POLICIES ..... 17

Influence of Retailers Within the ATA, Formation of the Cartel, and Promotion and Enforcement of MAPs ..... 22

The ATA Begins Work With Co-Conspirators to Offer Retailers and Manufacturers Expanded Means to Push and Enforce MAP Policies ..... 23

The Conspiracy Continues ..... 25

Anticompetitive Effects ..... 27

ANTITRUST INJURY AND DAMAGES ..... 28

TOLLING OF THE STATUTE OF LIMITATIONS, FRAUDULENT CONCEALMENT, EQUITABLETOLLING AND CONTINUING VIOLATIONS ..... 29

CLASS ACTION ALLEGATIONS ..... 30

PLAINTIFF'S CLAIM FOR RELIEF
Violation of the Sherman Act
(15 U.S.C. §§ 1 and 3) .......... 32

PRAYER FOR RELIEF .......... 33

DEMAND FOR TRIAL BY JURY .......... 34

## INTRODUCTION

1. Plaintiff Jake Vale ("**Plaintiff**") brings this action under federal antitrust law, on behalf of himself and all others similarly situated (the "Class," defined *infra*), seeking to recover overcharge damages on behalf of a nationwide class of purchasers of Archery Products (defined *infra*) who were injured by conduct resulting from an agreement between Defendants to artificially raise, fix, maintain or stabilize retail prices for archery products in the United States through the collective implementation and enforcement of minimum advertised pricing policies ("MAP" or "MAPs") , and using Defendant **Archery Trade Association** ("ATA") to implement and enforce the agreement across its membership. The membership of the ATA spans the majority of Archery Products manufacturers, distributors, and retailers. Plaintiff brings these allegations based on personal knowledge as to his own actions, facts, and circumstances, and upon information and belief and the reasonable investigation of counsel as to all other matters.

2. The Archery Product Manufacturers Defendants are all manufacturers and sellers of Archery Products. They include Defendant Hoyt Archery, Inc. ("Hoyt"), a manufacturer and seller of Archery Products in the United States, and a member of Defendant **Archery Trade Association** ("ATA"); Defendant Bowtech Inc. ("Bowtech"), a manufacturer and seller of Archery Products in the United States and a member of Defendant ATA; Defendant Mathews Archery, Inc. ("Mathews"), a manufacturer and seller of Archery Products in the United States and a member of Defendant ATA; and Defendant Precision Shooting Equipment ("PSE"), a manufacturer and seller of Archery Products in the United States and a member of Defendant ATA.

3. The Archery Product Retailer and Distributor Defendants are sellers of Archery Products in the United States, through either a Distribution Channel or a Retail Channel or both. Defendant Cabela's LLC ("Cabela's") is a retailer and seller of Archery Products in the United

States and a member of Defendant ATA; Defendant Dick's Sporting Goods, Inc. ("Dick's) is a retailer and seller of Archery Products in the United States and a member of Defendant ATA; Defendant BPS Direct LLC, d/b/a/ Bass Pro Shops ("Bass Pro Shops") is a retailer and seller of Archery Products in the United States and a member of Defendant ATA; Defendant Jay's Sports, Inc. d/b/a/ Jay's Sporting Goods. Inc. ("Jay's Sporting Goods") is a retailer, distributer, and seller of Archery Products in the United States and a member of Defendant ATA; Defendant Kinsey's Outdoors Inc. ("Kinsey's) is a distributor of outdoor goods, including Archery Products, and a retailer and seller of Archery Products in the United States and a member of Defendant ATA; and Defendant Lancaster Archery Supply, Inc. ("Lancaster") is a leading distributor, retailer, and seller of Archery Products in the United States and a member of Defendant ATA.

4. As detailed below, Plaintiff alleges that the Defendant ATA chiefly, but not exclusively, was tasked by Archery Products Defendants manufacturers, distributors and retailers, and members of the ATA, to enter into Agreements. The agreement among the Defendants and their co-conspirators was meant to artificially fix, raise, maintain, or stabilize prices, including through the widespread adoption, implementation, and the enforcement of minimum advertised price ("MAP") policies. MAPs represent an artificial price floor, or the "lowest price a retailer can advertise the products for sale," including "online or anywhere in print." The conduct complained of constitutes a *per se* violation of antitrust law because direct competitors entered into a horizontal agreement to fix, raise, maintain, or stabilize prices. The Agreement and conduct are per se illegal under Section 1 of the Sherman Act. Alternatively, the Agreement unreasonably restrains trade in the relevant market(s) (defined below), causing substantial anti-competitive effects and inflated prices to consumers.

5. Moreover, the Agreement was part and parcel of an anticompetitive scheme under which the Manufacturers, Distributers, and Retailers leveraged their substantial market power and dominance to induce the Archery Products' sellers into agreeing to (a) impose minimum advertised pricing policies on the Consumers such as Plaintiff; (b) to fix prices at artificially high levels, unreasonably restrain trade, and to illegally maintain and enhance their monopoly power, by having Archery Products Sellers agree to impose minimum advertised price policies on consumers like the Plaintiff; and (c) to fix prices at artificially high levels, unreasonably restrain trade, and maintain and enhance their monopoly power.

6. Absent Defendants' anti-competitive conduct, Plaintiff and the other Class members would have paid less for each of the Archery Products purchased during the Class Period. As a result of Defendants' unlawful conduct, Plaintiff and the other Class members paid overcharges on their purchases of Archery Products throughout the Class Period. Plaintiff thus seek damages and equitable relief under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 & 2.

## JURISDICTION AND VENUE

7. Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit and reasonable attorneys' fees for Defendants' violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2.

8. Subject matter jurisdiction is proper pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. §15 (a), and 28 U.S.C. §§1331 and 1337, because the action arises under the laws of the United States.

9. Venue is proper in this federal judicial district under 15 U.S.C. § 15(a) because Defendants reside, or are found, or have an agent here. Alternatively, venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §1391 (b) and (c) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this district, and because a substantial part of events giving rise to Plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.

10. The Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

## PARTIES

### Plaintiff

11. Plaintiff Jake Vale is a citizen of Nevada who purchased one or more Archery Products subject to a MAP during the Class Period, that were manufactured by one or more Manufacturer Defendants or Retailer Defendants, and which were sold subject to a MAP during the Class Period (defined *infra*).

### Defendants

***Trade Association Defendants***

12. Defendant Archery Trade Association, Inc. ("**ATA**") is a Virginia corporation with its primary place of business at 117 South Valley, New Ulm, Minnesota. The ATA is the trade association that represents the economic interests of corporations involved in the manufacture, wholesale, retail, sales, and distribution of Archery Products. At all relevant times hereto, the ATA was an Active participant in the Archery products conspiracy to fix, raise, maintain, or stabilize

the prices of Archery Products in the United States. One of its primary purposes is to "maintain and enhance the profitability and economic viability of individuals, companies and corporations in the archery industry." At all relevant times, the ATA engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

***Upstream Manufacturer Defendants***

13. Defendant Hoyt Archery, Inc. ("**Hoyt**") is a Utah corporation with its primary place of business at 593 N Wright Brothers Drive, Salt Lake City, Utah. At all relevant times, Hoyt was a member of the ATA with a representative on the ATA's Board of Directors; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

14. Defendant Bowtech Inc. ("**Bowtech**") is a Delaware corporation with its primary place of business at 90554 Highway 99 N, Eugene, Oregon. At all relevant times, Bowtech was a member of the ATA with a representative on the ATA's Board of Directors; sold Archery Products subject to a MAP under the "Bowtech," "Excalibur Crossbow," "Diamond Archery," "Stryker Crossbows," and "Octane Accessories" trade names; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States alleged herein.

15. Defendant Mathews Archery, Inc. ("**Mathews**") is a Wisconsin corporation with its primary place of business at 919 River Road, Sparta, Wisconsin. At all relevant times, Matthews was a member of the ATA with a representative on the ATA's Board of Directors; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

16. Defendant Precision Shooting Equipment, Inc. ("**PSE**") is a Delaware corporation with its primary place of business at 2727 North Fairview Avenue, Tucson, Arizona. At all relevant

times, PSE was a member of the ATA with a representative on the ATA's Board of Directors; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States. PSE is owned by Heritage Outdoor Group LLC.

***Downstream Retailer and Distributer Defendants***

17. Defendant Cabela's LLC ("**Cabela's**") was a Delaware limited liability company with its primary place of business at 1 Cabela Drive, Sidney, Nebraska. Cabela's has 171 retail locations throughout the United States, as well as an internet storefront. Until 2017, Cabela's was a member of the ATA with a representative on its Board of Directors; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States. In 2017, Cabela's was acquired by Bass Pro Shops.

18. Defendant DICK'S Sporting Goods, Inc. ("**Dick's**") is a Delaware corporation with its primary place of business at 345 Court Street, Coraopolis, Pennsylvania. Dick's has 728 retail locations throughout the United States, as well as an internet storefront. At all relevant times, Dick's was a member of the ATA; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

19. Defendant BPS Direct, LLC, d/b/a Bass Pro Shops ("**Bass Pro Shops**") is a Delaware corporation with its primary place of business at 2500 E. Kearney Street, Springfield, Missouri. Bass Pro Shops has approximately 200 retail locations throughout the United States, as well as an internet storefront. At all relevant times, Bass Pro Shops was a member of the ATA; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

20. Defendant Jay's Sports, Inc. d/b/a Jay's Sporting Goods ("**Jay's Sporting Goods**") is a Michigan corporation with its primary place of business at 8800 S. Clare Avenue, Clare, Michigan. Jay's Sporting Goods has two retail locations in Michigan and an internet storefront. At all relevant times, Jay's Sporting Goods was a member of the ATA with a representative on the ATA's Board of Directors; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

21. Defendant Kinsey's Outdoors, Inc. ("**Kinsey's**") is a Pennsylvania corporation with its primary place of business at 1660 Steelway Drive, Mount Joy, Pennsylvania. Kinsey's distributes outdoor goods, including Archery Products, to more than 4,600 retailers across the United States, in addition to its own retail location and internet storefront. At all relevant times, Kinsey's was a member of the ATA with a representative on the ATA's Board of Directors; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

22. Defendant Lancaster Archery Supply, Inc. ("**Lancaster**") is a Pennsylvania corporation with its primary place of business at 2195A Old Philadelphia Pike, Lancaster, Pennsylvania. Lancaster describes itself as "a leading worldwide archery distributor" with its own retail location and internet storefront. At all relevant times, Lancaster was a member of the ATA with a representative on the ATA's Board of Directors; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

***Co-Conspirators and Agents***

23. Co-Conspirator TrackStreet, Inc. ("**TrackStreet**") is a Delaware corporation with its primary place of business at 9811 W Charleston Blvd, Suite 2-776, Las Vegas, Nevada. At all

relevant times, TrackStreet provided Defendants with software to create, track, and enforce their MAP policies. In particular, TrackStreet provides brands with digital tools to track and enforce pricing policies such as MAP policies. Its features include on-demand notifications of MAP violations and customizable messages to send to violators. In addition, TrackStreet also helps clients to formulate pricing policies, including MAP policies. At all relevant times, TrackStreet engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

24. Co-Conspirator NeuIntel LLC, d/b/a PriceSpider, f/k/a Oris Intelligence ("**Oris**"), is a California corporation with its primary place of business at 20 Pacifica, Suite 1000, Irvine, California. At all relevant times, Oris provided Defendants with software to create, track, and enforce their MAP policies. In particular, Oris touts its MAP monitoring solution, Prowl, as "the world's most advanced MAP monitoring software." Oris also advises on the content of MAP policies and provides MAP violation letter templates. At all relevant times, Oris engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

25. Various other individuals and entities that are not named as defendants herein participated as co-conspirators with Defendants in the violations alleged herein and performed acts and made statements in furtherance of the conspiracy. Co-conspirators include but are not limited to all other entities that were ATA members at any and all relevant times.

## INTERSTATE TRADE AND COMMERCE

26. The activities of the Defendants, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

27. During the time period covered by this Complaint, Defendants sold and distributed Archery Products throughout the United States.

28. Defendants have sold and shipped substantial quantities of Archery products in a continuous uninterrupted flow of interstate commerce to customers located in states other than the states in which Defendants produced Archery Products.

## THE RELEVANT MARKET

29. Defendants' price fixing agreement is unlawful under the *per se* standard, which does not require relevant market definition.

30. To the extent definition of a relevant geographic market is legally relevant in this action, the geographic market is the United States.

31. To the extent the definition of a relevant product market is legally relevant in this action, the relevant market is Archery Products, products used by consumers for bowhunting or archery. For purposes of this action, Archery Products consists of five main product markets, submarkets, or cluster markets: (1) bows including compound bows, recurve bows, longbows, and crossbows and their components; (2) arrows (minus the arrowhead) and their components, including the shaft, fletching, and nock; (3) arrowheads (or arrowpoints) including broadheads and field points; (4) targets, including bag targets, foam targets, and 3D targets; and (5) accessories, such as bow cases, arrow quivers, sights and scopes, and stabilizers. "The US [had] 9.9 million bowhunters, 17.6 million recreational archers and 5.4 million competitive archers….," according to a 2020 nationwide survey conducted by McKinley Advisors on behalf of the Archery Trade Association.

32. Because Defendants conspired to raise prices through the adoption, implementation, and enforcement of MAPs on the Archery Products market in the United States as a whole, it is appropriate to analyze the competitive effects of the MAP policies on this market

as a whole. That is, grouping these products into a single product market allows for an efficient analysis of the competitive effects of the industry-wide MAPs without any analytical difference.

33. At all relevant times, Defendants and their co-conspirators have collectively possessed market power at each level of the United States market for Archery Products, including the manufacturing, distribution, and retail sales level. That is, they maintained the ability to raise prices significantly above competitive levels profitably, without losing a commensurate number of sales.

34. Specifically, a hypothetical firm or cartel that controlled the substantial share of the market for Archery Products, as Defendants and their co-conspirators do, could profitably impose a small but significant non-transitory increase in prices for Archery Products. Due to the conduct challenged herein and other factors, consumers would not be able to defeat such artificial price inflation by shifting to other companies or products.

35. At all relevant times, Defendants and their co-conspirators have collectively possessed market power at each and every level of the United States market for Archery Products, including the manufacturing, distribution, and retail sales level. That is, they maintained the ability to raise prices significantly above competitive levels profitably, without losing a commensurate number of sales.

## ATA INVOLVEMENT IN THE CONSPIRACY

### The ATA

36. The ATA is a trade association representing manufacturers, retailers, distributors, and others engaged in the Archery Products industry. The ATA's website offers several membership categories including, and not limited to, "Retailers & Ranges," "Manufacturers & Distributors,"

and "Sales Representative[s]." Applications for membership require a set of verification documents and are subject to review by ATA staff.

37. The ATA offers significant benefits to those who join. Membership allows one to attend the "ATA Show," an annual trade show centered on the archery and bowhunting industries, participate in ATA Connect, an exclusive online discussion forum, and gain access to a Member Directory. In addition, beginning in 2022, membership in the ATA allowed members to gain access to the annually updated Retail Business Tracker Survey, which provides self-reported, granular information on a range of competitively sensitive information, including seasonal sales numbers, price ranges, and percentages of sales by product type.

38. The ATA's member-exclusive events, online communication channels, and resources described herein, along with the ATA Board of Directors and ATA Retail Council, provided Defendants and their co-conspirators with the opportunities necessary to generate and execute an effective conspiracy.

**The ATA Board**

39. The ATA is governed by a Board of Directors made up of various representatives from manufacturers, distributors, and retailers of Archery Products. The Board, per Section 5.01 of the ATA's bylaws, manages "all of the [ATA's] activities and affairs[.]"

40. Throughout the Class Period, several agents from Manufacturer Defendants and Retailer Defendants have served on the ATA's Board of Directors. These include those who engaged in horizontal competition against each other. For example, Manufacturer Defendants BowTech, Hoyt, Lancaster, Mathews and PSE all had representatives on the Board in 2018 and 2019. Retailer Defendants BPS, Cabela's, Jay's Sporting Goods, and Kinsey's had representatives on the Board at various times between 2014 and 2024.

41. The Defendants and their co-conspirators thus had the opportunity to and did form a conspiracy, and in furtherance of that conspiracy knowingly promulgated anticompetitive rules, guidelines, and procedures related to MAP policies, with the express purpose of restraining competition for Archery Products sold in the United States.

**The ATA Retail Council**

42. In 2016, the ATA "revitalized its Retail Council to provide more guidance and support to the organization's retail members." At the time of the relaunch, ATA Retail Council members emphasized the need for coordination between its members. Jay McAninch, then President and CEO of the ATA stated that the Council was "ready to help forge a better future for everyone in our industry."

43. Throughout the Class Period, several agents from Retailer Defendants, including those engaged in horizontal competition against each other, served on the ATA Retail Council. For example, within the Class Period, agents from Retailer Defendants Bass Pro Shops, Lancaster, and Jay's Sporting Goods had representatives on the Council.

44. Following its reestablishment, the Retail Council has met weekly "to discuss pressing issues." These pressing issues included MAP policies and their enforcement. For example, on March 20, 2019, Kurt Smith, then a member of the Council, and the ATA's Director of Industry Relations for the Retail Council, stated that MAPs were "probably one of the most talked about topics in the archery industry."

**ATA Trade Shows**

45. The ATA runs the "ATA Show," which is an annual trade show event centered on the archery and bowhunting industries. It is the largest archery-only trade show in the world and, according to www.bowhunting.com, "the archery industry's biggest event of the year."

46. Throughout the Class Period, the ATA Trade Show has only been open to ATA members. The ATA implemented this requirement in 2011 specifically to prevent the attendance of "those who undercut the ATA's pro shop dealers…"

47. The ATA trade show brings together horizontal competition across each level of the Archery supply chain. This is an event largely attended by retailers and manufacturers all engaged in competition with each other. For example, in 2016, every major bow manufacturer was present at the show. This is a members-only event, not open to the general public.

48. MAP policies are openly and regularly discussed at the Trade Show. At the 2015 ATA Trade Show, approximately 60 representatives from ATA-member manufacturers, distributors, and retailers convened to review and discuss a sample MAP/MPR policy. These discussions provided opportunities for competitors to align pricing enforcement strategies and to collectively pressure non-compliant members.

49. MAP policies are important for archery industry manufacturers. Archery manufacturers, such as Bowtech, have explicit MAP policies in place that retailers must adhere to when advertising their products. Violation of these policies can lead to penalties, including loss of advertising funds, account suspension, or even termination of the retailer relationship.

50. The Board of Directors oversees critical ATA functions: approving bylaws, enforcing the Code of Conduct, sanctioning board-level initiatives like Minimum Advertised Price ("MAP") policy, overseeing the ATA Trade Show, and setting strategic direction, serving as a centralized forum where competitors can align on pricing, marketing, and advocacy actions.

**ATA Connect**

51. As a benefit to being a member of the ATA, members can participate in a members-only online discussion community called ATA Connect. ATA Connect includes the MyATA

Network, which can be accessed by all ATA members regardless of membership type, and the Retail Growth Interact community, which is "exclusive to ATA-member retailers."

52. The ATA has, throughout the relevant period, invited its members to use ATA Connect to exchange competitively sensitive information, including those related to pricing. For example, as of 2018, the ATA specifically identified Retail Growth Interact as a "great place to share ideas and ask questions about the topics that matter most to your business, including buying patter[n]s, profit margins and what to charge for services."

**The ATA Retail Business Tracker Survey**

53. In 2022, the ATA announced the release of the ATA Retail Business Tracker Survey. This was described as a "new quarterly survey to gain insight from retailers across the country to help members adapt to changing conditions regionally as well as to compare your business to what is happening nationally." The ATA explained that it would put together a Retail Trend Tracker survey each quarter, send the questionnaire to retailer members of the ATA, then "share[] the data gathered from the survey with distributors, manufacturers, and retailers in an easily digestible report."

54. An ATA article discussing the new survey, entitled "Download the Latest ATA Retail Trend Tracker Survey for Valuable Data About Market Trends," displayed the kind of competitively sensitive information it would gather, including seasonal data, sales by product type, and price ranges. The ATA made clear that horizontal competitors could use this information to coordinate pricing: "[t]his data allows you to see how your shop compares to your peers." The ATA further advises its members that "these surveys provide insight from archery retailers across the country that help members adapt to changing conditions locally and throughout the country."

55. The collection of this survey data by the ATA and its exclusive distribution to members of the ATA helped facilitate Defendants' conspiracy by ensuring that, within the Class Period, each Defendant had effective, up-to-date retail price information with which to carry out their conspiracy.

## DEFENDANTS' AGREEMENTS TO ADOPT AND ENFORCE MAP POLICIES

56. Throughout the Class Period, ATA members viewed retail price competition for Archery Products as a threat to profitability. Therefore, beginning in 2014, Manufacturer Defendants, Retailer Defendants, and their co-conspirators began utilizing the ATA to generate and carry out an unlawful conspiracy to lessen competition for Archery Products through the coordinated adoption and enforcement of MAP policies.

57. The ATA participated in this conspiracy by pushing its membership to adopt and enforce MAP policies, and by actively assisting their members, including Defendants and their co-conspirators, in the enforcement of those MAP policies. The goal of this conspiracy was to artificially fix, raise, maintain, and/or stabilize the price of Archery Products sold throughout the United States at supracompetitive levels, which it was able to pull off.

58. MAPs existed in the Archery Product industry well in advance of 2014. However, such policies were often ineffective, so Archery Product manufacturers and retailers found it difficult to compete with their competitors who did not set up or enforce such policies. Absent some mechanism for collective enforcement against violators, manufacturers which did not have, or did not enforce, a MAP policy could take share from competitors who did, while retailers retained incentives to increase volume by disregarding such policies, or by working with manufacturers which did not have, or enforce, MAP policies.

59. The fact that there was little if any enforcement of MAP policies, ATA distributors and retailers began to express concern about the deleterious effects that price competition was having on their bottom line. In 2011, by giving dealers a chance to talk openly about pricing issues in a forum and being sure manufacturers have a chance to hear and react to any concerns raised, they believed the problem can be substantially improved.

60. In late 2014, the ATA began to take more aggressive steps towards the adoption and enforcement of MAP policies by its members. In a communication on December 31, 2014, which has since been deleted, McAninch instructed ATA member companies to stop ignoring MAP, and that "United We Stand, Divided We Fall." McAninch acknowledged the importance of adopting and enforcing MAP policies:

> I believe to deal with this MAP issue, our industry must hold an open, honest dialogue about it. Everyone must participate because if we don't address the damage to our business model, we risk losing in the long term the sustained growth we've enjoyed. Since this involves everyone the ATA is the right group to facilitate this discussion and provide the vehicle for the industry to unite behind constructive, positive changes.
>
> To ensure the industry addresses these issues, we've engaged the ATA Board of Directors; and the leaders of ARRO, NABA, NBS and Sports Inc. We've also included manufacturers and distributors who expressed interest in MAP. In the months ahead, we'll facilitate a dialogue that examines what our industry's business leaders think can and should be done about MAP. To that end, the ATA will offer our MAP policy as a template that companies can use as a tool if they take action.
>
> We can't solve industry problems until we involve everyone in a conversation that shares concerns and develops a course of action. This first step basically "turns on the lights" because it requires everyone to share what they think about this issue's impacts on our industry. Once we have a clear sense of what MAP is about for ATA members, we can start a process that deals with it

61. In McAninch's communication, the ATA issued a draft MAP policy for manufacturers designed to "protect our companies from state and federal legal actions, while clearly informing other companies of their unilateral policy on product pricing."

62. Throughout the next year, the ATA began taking greater steps to ensure that its members were made aware of the need to adopt and enforce MAP policies. In January 2015, at a seminar after a trade show, the ATA issued a newsletter counseling its various members, many of which engage in horizontal competition, on crafting "customized" policies to protect their minimum advertised price. The newsletter assured them that "the ATA can provide help and information so individual manufacturers can craft their own policies, which the companies must then enforce themselves." It also revealed the ATA's "three-step plan" to help its members generate and enforce their own MAP policies. The ATA ensured that these "three-steps" were broadly disseminated, tweeting them on February 9, 2015.

63. In a February 6, 2015 newsletter, the ATA expanded on the MAP training provided to members. The newsletter acknowledged that while the ATA could not set or enforce MAP or MRP policies itself—because doing so would violate antitrust laws—it could provide guidance and resources to help individual manufacturers develop and implement their own policies. This training built on a 2014 sample MAP policy provided by the ATA, which included a "three-step plan" designed to assist ATA-member manufacturers and distributors in tailoring and adopting their own MAP policies.

64. By June 2015, Defendant Kinsey's announced the adoption of a new MAP policy. In a press release published in Archery Wire, the company stated: "Kinsey's stands behind manufacturers in their implementation of minimum advertised pricing to protect the interests of their brands, as well as margin integrity within the retail network."

65. Various retailers, including Retailer Defendants, followed these signals from ATA representatives. In June of 2015, Kinsey's announced their "new Minimum Advertised Price (MAP) policy," stating that "MAP policies exist to benefit both retailers and manufacturers by

elevating perception of brand value, which leads to increased margins for retailers." For this, Kinsey's was applauded by Randy Wood, Vice President of Sales for the manufacturer TenPoint Crossbow Technologies: "Kinsey's has done a great job of backing TenPoint's enforcement of its MAP policy, thus strengthening the TenPoint brand as well as helping the retailers maintain a solid profit margin."

66. By March 2016, the ATA was actively working to ensure that its member manufacturers, distributors, and retailers were enforcing the rules of its cartel by adopting and cooperatively enforcing MAP policies. At that time, the ATA was directing all "Members Interested in MAP Policies" to contact the ATA "for resources about creating a MAP policy for [their] company." The ATA made clear that such resources were "available only to ATA members and are included in your membership."

67. Jay Scholes, co-founder of an outdoor industry sales firm called OutTech, emphasized that MAP was an opportunity for retailers and manufacturers to "work hand in hand." He added that "We're responsible for upholding our sport, for making sure our retailers make money, and ensuring manufacturers also make money. MAP is a good thing for our industry."

68. The success of this industry-wide MAP initiative depended heavily on the active cooperation of Archery Product distributors and retailers. Since many Archery Product resellers source Archery Products from distributors or retailers rather than directly from manufacturers, MAP policies would only be effective if those distributors and retailers rigorously monitored and enforced the manufacturers' MAP policies.

69. Ben Summers, Operations Director at T.R.U. Ball Archery Releases and Axcel Archery Sights, and then-vice President of ATA's Board of Directors, recounted how "[McAninch] always talks about shining light in dark corners so people can be seen for what they're doing, and

be held accountable." He stressed the importance of enforcing MAP to the ATA's members: "If you have a MAP price structure, you must be smart and proactive about going out and finding people who break your MAP policy."

70. An example of the type of policing the supply chain was enacted by T.R.U. Ball Archery Releases which provides an exemplar of how to effectively participate in the ATA's conspiracy by adopting a schedule of strict penalties for "MAP Violators" at all levels of the supply chain. For retailers who sold T.R.U. Ball Archery Releases products directly to consumers, the following conditions applied:

> **New MAP Violator**:
>
> A warning will be issued. Violator will be evaluated in approximately two weeks to determine if they have raised prices to MAP levels.
>
> **Repeat MAP Violator:**
>
> First repeat infraction – Violators who have been notified that they are below
>
> MAP pricing within the last six months will be given a 48 hour warning to raise prices to MAP levels. Violators who have not raised prices to MAP levels after this time period will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for 30 days.
>
> **Second repeat infraction**:
>
> Violators who have been listed on the T.R.U., Inc. Do Not Sell List within the last six months who knowingly lower their prices below MAP level for a second time will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for 60 days.
>
> **Three or more repeat infractions:**
>
> Violators who have been listed on the T.R.U., Inc. Do Not Sell List within the last six months who knowingly lower their prices below MAP level for more than two times will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for the greater of 60 days or until prices have been raised to MAP levels for at least 30 days.

For distributors who sold T.R.U. Ball Archery Releases products to other resellers, additional conditions applied:

**Distributor Violators:**

T.R.U., Inc. will be using contacts from around the United States to purchase products from sources who are known to be violating MAP levels.

**First infraction:**

Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List for 30 days.

**Second infraction:**

Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List for 60 days.

**Third infraction:**

Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List indefinitely.

71. These discussions indicate that, by this point, Defendants' and their co-conspirators' conspiracy was succeeding in pushing ATA members to coordinate in the adoption and enforcement of MAP policies to artificially fix, increase, or stabilize the price of Archery Products.

**Influence of Retailers Within the ATA, Formation of the Cartel, and Promotion and Enforcement of MAPs.**

72. Retailers stood to benefit most from the conspiracy to raise prices through the adoption of MAP policies. In July of 2017, the ATA Board was expanded to add seats for representatives from the National Archery Buyers Association ("NABA"), which features a number of retailers and distributors of Archery Products, and from the Archery Range and Research Organization ("ARRO"). McAninch welcomed this expanded influence for retailers.

73. NABA's President Gary Kinard noted that it was "refreshing to see the ATA Board of Directors recognize the need for better representation for the independent retailer." The ARRO

executive secretary, Deb Colgrove, similarly remarked that the ATA had recently "been working to help retailers be more profitable", and expressed her hope that this Board seat would continue to strengthen communication between ARRO, the ATA, and various manufacturers,

74. By 2022, Retailers further benefited with the release of the ATA Retail Business Tracker Survey, which was described by the ATA as follows:

> As an archery business, data and reliable facts play a pivotal role in making critical decisions. To address that need, the ATA is launching a new quarterly survey to gain insight from retailers across the country to help members adapt to changing conditions regionally as well as to compare your business to what is happening nationally.

75. On the ATA website, the organization explained the process and aims of the survey:

> The ATA puts together a Retail Trend Tracker survey each quarter and sends the questionnaire to retail members in order to curate relevant and informative data about the state of the industry according to the retail shops' experience. The ATA then shares the data gathered from the survey with distributors, manufacturers, and retailers in an easily digestible report. The data is provided collectively for each region.

76. The purpose of the Tracker Survey was explained in an article titled "ATA Members Capitalize on Data Shared in ATA's Retail Trend Tracker Survey." The ATA stated that it intended for its members to use the survey data to compare their businesses with regional competitors, explaining that "[s]ince each region of the country is represented in the report, retailers and manufacturers can study any discrepancies in the results and adjust accordingly, based on the data in their region."

**The ATA Begins Work with Co-Conspirators to Offer Retailers and Manufacturers Expanded Means to Push and Enforce MAP Policies**

77. From 2018 onward, Defendants, through the ATA, continued their conspiracy to coordinate the industry-wide adoption and implementation of MAPs. In September 2018, the ATA

updated its website to remind manufacturers that the ATA "would work with [them] to develop a MAP policy."

78. In December 2018, the ATA updated its website to include a special prompt for manufacturers to send the ATA their MAPs to load onto the members-only "Resource Library." The ATA cautioned retailers that it was their "responsibility to know MAP policies and follow them."

79. On March 20, 2019, the ATA hosted TrackStreet's Ryan Erickson on its podcast, Beyond the Bow, in an episode entitled "MAP Policies & Enforcement." On the episode, Kurt Smith, the host, introduced MAPs as "one of the most talked about topics in the archery industry." Throughout the conversation, Erickson emphasized the importance of creating and enforcing MAP policies: "[E]ach individual brand has to be on the same page . . . [A]t the founding of our country, Benjamin Franklin said we must all hang together or most assuredly, we'll hang separately." Later in the podcast, Erickson emphasized the importance of larger firms adopting MAP policies, and how that would inspire others in the industry to follow: "[A]s soon as a couple big brands hop on, then all of a sudden that provides an umbrella coverage for the rest of the brands to move forward." Last, Erickson thanked the ATA for all the work they performed to encourage the adoption of MAP policies throughout the industry: "I would say [it] is unparalleled in terms of the efforts that the ATA is making."

80. The next day, the ATA promoted this podcast on both Twitter and Facebook.

81. Manufacturers, distributors, and retailers also emphasized the importance of MAP policies, and the stringency with which they followed them, in trade journals. These statements, again, served as signals to other ATA members to join Defendants' conspiracy. For example, in the August 2019 edition of Inside Archery, it was noted that "Kinsey's is using its far-reaching

influence to help enforce MAP policy. This effort is also geared towards helping dealers and strengthening the industry at large." Justin Gorman, director of sales at Kinsey's added:

> "We work closely with our vendor partners and retail partners to monitor and enforce MAP policy. There are a lot of methods out there, and there really is no simple solution, but by working together, we have the ability to bring positive change to the industry. Kinsey's has a very up-to-date and sophisticated warehouse management system, and it allows us to automatically restrict sales to shops that violate MAP. It's not something we need to remember to jot down on a notepad, it's programmed into the system . . . Kinsey's certainly can't solve this problem by itself. Everyone needs to pull their own weight, but we are doing all we can to help protect the honest shops that don't violate MAP, which are the shops that actually get hurt when someone else breaks the rules."
>
> Gorman emphasized that when a violator is caught, "they lose the ability to buy that product from [Kinsey's]. They also can't buy it online or through the manufacturer because we work closely with vendors to build a 'do-not-sell' list."

82. In the December 2019 issue of Inside Archery, a representative from Victory Archery stated that they spend "a great deal of time and energy to enforce MAP pricing[.]"

83. The March 2020 issue of Inside Archery quoted one David Kronengold, a former general manager of PSE, as saying, "[t]he industry is in a hard place, but we are not going to wait for anyone else to fix it for us. We are going to make it part of PSE's business strategy to drive improvement and fix everything we can. And we are doing all of this while fully acknowledging that if we are successful, then we are also benefiting our competitors."

84. Since 2021, the ATA has taken steps back from its public endorsement of MAPs. Multiple articles on the ATA's website which pushed for stricter enforcement of MAPs have been deleted to obscure the organization's central role in the conspiracy.

**<u>The Conspiracy Continues</u>**

85. Defendants' conspiracy continues through the present: The ATA continues to offer its help to work with its members to develop a MAP policy; it still offers discount programs for

ATA members to hire outside vendors to seek out MAP violators; and various ATA members, including Retailer Defendants and Manufacturer Defendants, continued to use MAPs and advertise products under MAPs. For example, in both the January 2023 and January 2024 editions of Inside Archery, Steve Greenwood, a General Manager at Victory Archery, stated that "[w]e police MAP 24/7."

86. The ATA remains actively involved in facilitating and supporting this unlawful conduct. It continues to offer assistance to its manufacturer members in "developing a MAP policy," publicly "advocates" for MAP enforcement on behalf of its members and endorses MAP practices across the industry. The ATA also promotes tools and services to help members enforce MAP policies, including offering "discount programs" for outside vendors that use web crawlers and other advanced software to detect online MAP violations.

87. The anticompetitive effects of this ongoing conspiracy persist. Consumers of Archery Products today continue to pay inflated prices that are the direct result of Defendants' coordinated price-fixing agreement.

88. The various means of communication between competitors that the ATA has generated and disseminated, such as the ATA Trade Shows, ATA Connect, ATA Retail Connect, the ATA Retail Business Tracker, and other forms of communication described herein, have allowed Defendants and their co-conspirators to exchange competitively sensitive information regarding price, with the specific intention and effect of increasing, stabilizing, or otherwise manipulating the price of Archery Products.

89. The ATA Retail Business Tracker Survey was available through 2024 exclusively to ATA members, who include industry participants such as retailers, manufacturers, and distributors, including Defendant Retailers. Therefore, for much of its existence, the ATA Retail

Business Tracker Survey consisted of a set of competitively sensitive information which was compiled by the ATA from its member retailers, many of whom engage in horizontal competition, then distributed by the ATA right back to those same retailers.

90. The Federal Trade Commission ("FTC") has explicitly warned against this type of conduct. In guidance entitled "Spotlight on Trade Associations," the FTC warned:

> "[E]mployees should be careful when sharing information, they could not otherwise share with competitors through intermediaries such as a financial analyst or even a supplier if the consultant were to share that specific information with the company's competitors, resulting in a change in their pricing strategy, such indirect communications could be seen as facilitating an agreement if other evidence points to a coordinated strategy."

**<u>Anticompetitive Effects</u>**

91. Defendants and their co-conspirators, through their exchange of competitively sensitive information, and their conspiracy to fix, increase, or stabilize the price of Archery Products through the coordinated the adoption and enforcement of MAP policies, were able to ensure that consumers of Archery Products were charged supracompetitive prices.

92. MAP policies restrict competition and increase prices for consumers by coordinating a critical mass of horizontal retail competitors, which causes MAPs to reduce the incentives for those retailers to engage in horizontal price competition. Retailers subject to an effective MAP face no incentive to vigorously compete by advertising their lower retail prices because, should they do so, they would threaten their supply of the goods in question. Even if the retailer does, in fact, offer a lower price for the goods, MAPs prevent them from advertising that lower price. Additionally, if retailers still retain incentives to offer discounts following the adoption of MAPs, the MAP sets the terms of price negotiation at an artificially high level. An arrowhead which is discounted from the MAP will still be sold at a level higher than its actual competitive

price because the MAP raises the "starting price," or the price range, from which any discounts on that arrowhead are calculated.

93. Defendants' information exchange also has had the effect of harming competition for Archery Products. This information exchange allows retailers access to information from their horizontal competitors on prices, supply, demand, and other key factors which, in a competitive market, would be unknown. With this non-public information known to horizontal competitors, those competitors have less incentive to engage in competition.

94. The existence of this information sharing agreement is particularly egregious given that these products are also subject to a MAP. According to the ATA, MAP policies are intended to ensure that retailers can "compete fairly and evenly on service instead of price." "[MAP] policies level the playing field for all retailers, and eliminate the 'race to the bottom' that would occur if retailers endlessly competed to reduce prices"; "MAP policies help small businesses compete and sell on service and value, rather than waging price wars with other retailers."

95. Defendants' provision of competitively sensitive information relating to non-price variables also allowed for stronger coordination of their separate scheme to coordinate the adoption and enforcement of MAPs, as it allowed Defendants and their co-conspirators to ensure that their horizontal competition was not undercutting the MAP price.

96. As a result the conspiratorial behavior and violations of the antitrust law alleged herein, Plaintiff and the members of the Class sustained injuries and damages.

## ANTITRUST INJURY AND DAMAGES

97. Defendants' anticompetitive conduct has had the following effects, *inter alia*:

a) Price competition in the Archery Products has been restrained or eliminated;

b) Prices for Archery Products sold by the Manufacturer and Retailer Defendants and their divisions, subsidiaries, affiliates, or co-conspirators, in turn, have been raised, fixed, maintained, or stabilized at artificially high, noncompetitive levels throughout the United States;

c) Direct purchasers of Archery Products have been deprived of free and open competition; and

d) Direct purchasers of Archery Products have paid artificially inflated prices.

98. The purpose of Defendants' and their co-conspirators' conduct is to raise, fix, maintain, or stabilize the price of Archery Products and, as a direct and foreseeable result, Plaintiff and the class have paid supracompetitive prices for Archery Products during the Class Period.

99. Because of the alleged violations of the antitrust laws, Plaintiff and Class Members have sustained injury to their businesses or property, having paid higher prices for Archery Products than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, they have suffered damages. This is an antitrust injury against which antitrust laws were created to protect.

## TOLLING OF THE STATUTE OF LIMITATIONS, FRAUDULENT CONCEALMENT, EQUITABLE TOLLING AND CONTINUING VIOLATIONS

100. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth.

101. Plaintiff did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims sued upon herein until immediately prior to commencing this civil action.

102. Any applicable statutes of limitation have been tolled by Defendants' affirmative acts of fraudulent concealment and continuing misrepresentations.

103. Defendants continue to engage in deceptive practices and, consequently, unwary consumers are injured on a daily basis by Defendants' unlawful conduct. Therefore, Plaintiff and

the Class submit that each instance that Defendants engaged in the conduct complained of herein and each instance that a member of the Class purchased an Archery Product constitutes part of a continuing violation and operates to toll the statutes of limitation in this action.

104. Defendants are estopped from relying on any statute of limitations defense because of its unfair or deceptive conduct.

105. Defendants' conduct was and is, by its nature, self-concealing. Still, Defendants, through a series of affirmative acts or omissions, suppressed the dissemination of truthful information regarding their illegal conduct, and have actively foreclosed Plaintiffs and the Class from learning of their illegal, anti-competitive, unfair and/or deceptive acts.

106. By reason of the foregoing, the claims of Plaintiff and the Class are timely under any applicable statute of limitations, pursuant to the discovery rule, the equitable tolling doctrine, and fraudulent concealment.

## CLASS ACTION ALLEGATIONS

107. Plaintiff brings this action both on behalf of himself and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of the following class (the "Class"):

> All persons and entities residing in the United States or its territories that directly purchased Archery Products (defined above) manufactured or distributed by an Archery Trade Association member, at any point between January 1, 2014 and the present (the "Class Period"). Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

108. ***Numerosity***. Plaintiff does not know the exact number of Class members because such information is in the exclusive control of Defendants and co-conspirators. Plaintiff believes that, due to the nature of the trade and commerce involved, there are most likely hundreds of thousands of Class members, geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

109. ***Typicality***. Plaintiff's claims are typical of the claims of the Class in that Class members all purchased Archery Products subject to a MAP. All Class members were damaged by the same wrongful conduct of Defendants and their co-conspirators as alleged herein, and the relief sought is common to the Class.

110. ***Commonality***. Numerous questions of law or fact arise from Defendants' anticompetitive conduct that are common to the Class, including, but not limited to, the following: (a) Whether Defendants and co-conspirators engaged in a contract, combination, and/or conspiracy to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States; (b) Whether Defendants' and co-conspirators' conduct caused the prices of Archery Products sold in the United States to be sold at artificially high and supra-competitive levels; (c) Whether the Plaintiff and the other members of the Class were injured by Defendants' and co-conspirators' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and (d) The scope of any injunctive relief to which Plaintiff and the other members of the Class are entitled.

111. ***Predominance***. These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members. In addition, Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

112. ***Adequacy***. Plaintiff will fairly and adequately represent the interests of the Class in that he has no conflict with any other members of the Class. Furthermore, Plaintiff has retained competent counsel experienced in antitrust, class action, and other complex litigation.

113. ***Superiority***. This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a

class action. In addition, the prosecution of separate actions by individual Class and would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## PLAINTIFF'S CLAIM FOR RELIEF

### Violation of the Sherman Act
### (15 U.S.C. §§ 1 and 3)

114. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth.

115. Beginning no later than 2014 and continuing to the present, Defendants and their co-conspirators have engaged in a conspiracy and agreement in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). Their cartel, chiefly orchestrated through the ATA, was designed to artificially raise prices and eliminate horizontal price competition for Archery Products at the retail level. The primary means by which Defendants and their co-conspirators operate the cartel is through their agreement for the widespread adoption, implementation, and enforcement of MAP policies, which, in practice, set an artificial price floor and increase prices of Archery Products. The MAPs represented a drastic change in how Archery Products were sold in the United States.

116. Thus, this Complaint presents allegations of violations of the federal antitrust laws that are illegal *per se*.

117. In the alternative, Plaintiff alleges Defendants and their co-conspirators have engaged in a violation of Sections 1 and 3 of the Sherman Act under either a quick look or a fully-fledged rule of reason analysis.

118. As a result of Defendants' and their co-conspirators' unlawful conduct, retail prices for Archery Products subject to agreed-upon MAPs were fixed, raised, maintained, or stabilized in the United States.

119. As a result of Defendants' and their co-conspirators' unlawful conduct, Plaintiff and the other members of the Class have been injured in that they have paid more for Archery Products than they otherwise would have paid in the absence of that conduct.

120. With respect to their claim under the Sherman Act, Plaintiff seeks injunctive relief, treble damages, and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court enter judgment on his behalf and on behalf of the Class herein, adjudging and decreeing as follows:

A. This action may proceed as a class action, with Plaintiff as the designated Class representative and his counsel as Class Counsel;

B. Defendants and their co-conspirators have engaged in a contract, combination, and conspiracy in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and that Plaintiff and the members of the Class have been injured in their business and property as a result of Defendants' and their co-conspirators' violations;

C. Plaintiff and the members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled to the extent such trebling is permitted pursuant to such laws;

D. Plaintiff and the members of the Class recover restitution to the extent such relief is afforded by any of the aforementioned laws;

E. Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other

persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F. Plaintiff and the members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G. Plaintiff and the members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

H. Plaintiff and the members of the Class receive such other or further relief as may be just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: August, 1, 2025

**TESKE LAW PLLC**

*/s Vildan Teske*
Vildan A. Teske (MN 241404)
Lee Owen (MN 0505523)
80 S. 8th Street, Suite 900
Minneapolis, MN 55402
Tel: (612) 746-1558
teske@teskelaw.com
owen@teskelaw.com

**GLANCY PRONGAY & MURRAY LLP**
Lee Albert (Pro Hac Forthcoming)
Brian Murray (Pro Hac Forthcoming)
Brian Brooks (Pro Hac Forthcoming)
230 Park Avenue, Suite 358
New York, NY 10169
Tel: (212) 682-5340
Fax: (212) 889-0944
lalbert@glancylaw.com

*Attorneys for Plaintiff and the Proposed Class*